1
2
3
4
5                        UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
6                                  AT TACOMA
7
8
9   PLATYPUS MARINE, INC., a Washington )
    Corporation,                        )
10                          Plaintiff,  )              No.: C05-5631RBL
                                        )
11  v.                                  )              ORDER ON SUMMARY
                                        )              JUDGMENT
12  SHERWIN-WILLIAMS, INC., an Ohio     )
    Corporation,                        )
13                          Defendant,  )
                                        )
14  _____  )
15
16        This matter is before the Court on defendant, Sherwin-Williams Company's, motion for

17  Summary Judgment.  Sherwin-Williams seeks a ruling as a matter of law that there was no breach

18  of either express warranty, implied warranty of merchantability or warranty of fitness for a

19  particular purpose between the plaintiff, Platypus Marine and Sherwin-Williams.

20                                  BACKGROUND

21        Platypus  refinishes the interior and exterior of yachts and other marine vessels.  Sherwin-

22  Williams sells paint products.

23        In the fall of 2002, Platypus contracted with the owner of a yacht known as the M/V

24  ALEXIS to refinish the vessels's interior.  Sylvia Bolton was hired by the owner of the M/V

25  Alexis to design the interior refinish.  According to the design specifications, the vessel interior

26  was to have a filled grain look, meaning that the grains of the interior wood would be filled so that

27  the surface would have a smooth look and feel.  In the past, Platypus had successfully used a

28  coating system comprised of an epoxy product from West Systems with a topcoat of Sherwin-

                                           1

1   Williams conversion varnish to acheive this grain-filled look.  However, such a system was

2   extremely time consuming, with long wait times before the coats of epoxy were dry enough to

3   sand.  Because of the large amounts of wood on the M/V Alexis and the fact that the owner of the

4   vessel required it to be completed in a short time frame, Platypus sought a faster system that

5   would accomplish the same finish with less down time.

6          In the fall of 2002, the president of Platypus contacted Sherwin-Williams' representative,

7   Ray Meador and briefly explained the project to him.  It was specifically explained that the epoxy

8   system previously used was too time consuming for the present project and Meador was asked if

9   Sherman-Williams could provide a system that would give a fill-grain look in less time.  After this

10  conversation, the project details were handed over to Doug Linde, the head of Platypus's finishing

11  department.

12         Linde contacted Meador by telephone in January 2003, described the scope of the project

13  and what Platypus needed.  Specifically, it was discussed that Platypus wanted to "fill the grain of

14  the wood", that Platypus wanted a "fast system" and that Platypus wanted a "quality system."

15  *Declaration of Eric B. Anderson*, dkt. #22, att. #2, pg. 8 (*Deposition of Doug Linde*).

16         In a letter dated January 20, 2003, from Ray Meador to Doug Linde, Meador quoted

17  prices for two finish systems.  One for an interior and one for exterior teak decks.  With regard to

18  the interior, the letter stated: "Need fill mahogany wood interior exposure."  The letter went on to

19  describe a "System" consisting of "1st coat Sher-wood Vinyl Sealer 24% solids," with a catalyst

20  and a price for each, and a "2nd coat Sher-wood Kemvar Conversion Varnish," with a catalyst and

21  price for each.  The letter then stated: "System not to exceed 5 mils dft (dry film thickness)."

22  *Declaration of Eric Anderson*, dkt. #22, att. #2, pg. 10.  Dry film thickness describes the total

23  thickness of both products in cross section after they have totally dried.

24         Before employing Meador's suggested finishing system, Platypus tested it on wood of the

25  type to be used on the M/V Alexis.  The grain fill product used, Sherwin-Williams Natural Wood

26  fill grain, left small white dots on the wood that were visible even after workers applied the

27  Sherwin-Williams sealer on top of the filler.  Because a perfect finish with no visible flaws was the

28  goal of the refinishing project, the appearance of visible white spots on the wood was

1    unacceptable.

2          After observing the white spots in the test piece, Linde called Meador and explained to

3    him that the wood fill was leaving white spots.  Meador suggested that Linde mix the wood fill

4    with stain in order to make it the same color of the wood.  *Deposition of Doug Linde*, pg. 21.

5    Linde suggested to Meador that he skip the wood fill process and go right to the sealer.

6    However, he was concerned that by using this technique, the maximum dft, according to the

7    product specifications, would be exceeded.  *Deposition of Doug Linde*, pg. 21-22.  Linde and

8    Meador concluded that after it (sealer)was all sanded down to the top of the grain of the wood,

9    "they would be fine."  *Deposition of Doug Linde*, pg. 9.  It was discussed that this process would

10   be okay if Platypus "would sand off more sealer than they put on."  *Deposition of Doug Linde*,

11   pg. 23.

12         Linde did some additional testing using this method, was pleased with the results and

13   decided to proceed with the work using the Sherwin-Williams sealer and varnish.  *Deposition of*

14   *Doug Linde*, pg. 22.

15         During the wood finishing process, Linde developed the specific procedures to be used

16   when applying the sealer and varnish. *Deposition of Doug Linde*, pg. 31.  In coming up with his

17   own procedures, Linde contradicted the specifications contained in the product data sheets.  The

18   product data sheets for the sealer recommended a film thickness of between 4.0 and 5.0 mils wet

19   and 0.7 to 0.9 mils dry.  It also instructs not to apply more than one coat of sealer for build.

20   *Declaration of Eric Anderson*, dkt. #22, att. #2, pg. 11-12.  Linde's initial procedures called for

21   three full wet coats of sealer and was later changed to four full wet coats.   *Deposition of Doug*

22   *Linde*, pg. 5.  The product data sheet for the sealer calls for a drying time of 30 to 45 minutes at

23   77 degrees before re-coating with another product.  *Declaration of Eric Anderson*, dkt. #22, att.

24   #2, pg. 11-12.  Linde's procedures called for three full wet coats, allowing to flash off between

25   coats.  Linde said that flash off takes 10 to 15 minutes.  *Deposition of Doug Linde*, pg. 29.  The

26   majority of the wood was coated using a sprayer in a spray booth off the boat.  *Deposition of*

27   *Doug Linde*, pg. 29.  The product data sheet for the varnish called for a drying temperature of 70

28   degrees or higher.  *Declaration of Eric Anderson*, dkt. #22, att. #2, pg. 13.  The temperature of

3

1    the spray booth was kept between 65 and 70 degrees.  *Deposition of Doug Linde*, pg. 32.

2         Platypus finished the M/V Alexis project in the summer of 2003.  In August of 2003, small

3    cracks were developing in the finish in various places throughout the boat and eventually the

4    entirety of the wood finishing failed.  Platypus retained Dr. Robert Fischer, Ph.D., to investigate

5    the cause of the failure.  Dr. Fischer specializes in materials characterization, particularly through

6    microscopic analysis.  He was provided a wood sample taken from the boat as well as the

7    Sherwin-Williams product specifications and a description of Platypus's application process.  He

8    then conducted an analysis of the wood sample and determined that the total dry film thickness of

9    the coating system ranged between 7.9 and 8.6 mils.  Dr. Fisher found that the excessive thickness

10   of the sealer contributed to the failure.  *Deposition of Robert Fischer*, dkt. #22, att. #2, pg. 32.

11                                SUMMARY JUDGMENT STANDARD

12        Summary judgment is appropriate when, viewing the facts in the light most favorable to

13   the nonmoving party, there is no genuine issue of material fact which would preclude summary

14   judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to

15   summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to

16   interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for

17   trial." *Celotex Corp. v. Catreti,* 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of

18   evidence in support of the non-moving party's position is not sufficient."  *Triton Energy Corp. v.*

19   *Square D Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not

20   affect the outcome of the suit are irrelevant to the consideration of a motion for summary

21   judgment. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986).  In other words, "summary

22   judgment should be granted where the non-moving party fails to offer evidence from which a

23   reasonable jury could return a verdict in its favor." *Triton Energy,* 68 F.3d at 1222.

24                                        DISCUSSION

25        The three claims before the Court allege breach of express warranty under RCW 62A.2-

26   313; breach of implied warranty of merchantability under RCW 62A.2-314; and breach of implied

27   warranty of fitness for a particular purpose under RCW 62A.2-315.  These provisions are part of

28   Article 2 of  the Uniform Commercial Code (UCC), as adopted in the State of Washington.

                                            4

Under Washington State law, an express warranty is created by:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to that description.

(c) Any sample or model which is made part of the basis of the bargain shall create an express warranty that the whole of the goods shall conform to the sample or model. *RCW 62A.2-313(1).*

It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the sellers opinion or commendation of the goods does not create a warranty. *RCW 62A.2*-313(2).

With regards to section (a), it is undisputed that Sherwin-Williams provided Platypus with a letter in January 2003 that broke down the stages of the process and specifically provided a maximum dry film thickness of 5 mils for the entire system. During a telephone call between Doug Linde and Ray Meador in which they discussed skipping the wood-fill stage of the process and proceeding directly to the application of the sealer stage of the process, Linde expressed concern that if the sealer was used as a filler, the 5 mil dft maximum would be exceeded. This conversation concluded with Meador saying it should be fine because you were going to take off more (sealer) than you put on. The more specific a statement, the more likely it is an affirmation of fact or promise. *Federal Signal Corp. v. Safety Factors, Inc.,* 125 Wn.2d 413, (1994) citing *James J. White & Robert S. Summers, Uniform Commercial Code* §9-4, at 445-47 (3d ed. 1988). A written statement is less likely to be puffery. *Federal Signal Corp. v. Safety Factors, Inc.,* 125 Wn.2d 413, (1994) citing *James J. White & Robert S. Summers, Uniform Commercial Code* §9-4, at 445-47 (3d ed. 1988). The statements made by Ray Meador in the above mentioned telephone call do not rise to the level of an affirmation of fact or promise. There is no evidence that Ray Meador told Doug Linde that he could disregard the specified maximum thickness of 5 mils dft for the entire system. Ray Meador's statement does not constitute an affirmation or promise that the sealer would not fail if applied in excess of the more specific written product

5

1    specifications provided to Platypus.

2          With regards to section (b) there is no evidence to support an express warranty claim
3    because there was no description of goods that was made a part of the basis of the bargain.
4    Furthermore, there is no evidence to support an express warranty claim under section (c) because
5    there is no evidence that the products did not conform with any sample provided.

6          Under Washington State law, unless excluded or modified, a warranty that goods are
7    merchantable is implied in a contract for their sale, so long as the seller is a merchant with respect
8    to goods of that kind. *RCW 62A.2-314(1).* This implied warranty of merchantability assures that
9    goods are fit for the ordinary purposes for which such goods are used. *RCW 62A.2-314(2)(c).*
10   The phrase "fit for the ordinary purposes" embodies the concept "that goods be reasonably fit for
11   their usual, intended purpose, i.e., reasonably safe when put to their ordinary use and reasonably
12   capable of performing their ordinary functions." *Federal Signal Corp. v. Safety Factors, Inc.,*
13   125 Wn.2d 413, (1994).  RCW 62A.2-314 defines a breach of the warranty of merchantability by
14   looking to the general uses of a product and expectations in the trade.

15         In this case, the ordinary use of the sealer is to prevent moisture from going through the
16   substrate and to improve adhesion to the topcoat.  There is no evidence to indicate that the
17   Sherwin-Williams sealer was not fit for this ordinary purpose.  The ordinary purpose of the
18   varnish is to protect the wood substrate and give a nice looking finish.  There is no evidence to
19   indicate that the Sherwin-Williams varnish was not fit for this purpose.

20         Under Washington State law, where the seller at the time of contracting has reason to
21   know any particular purpose for which the goods are required and that the buyer is relying on the
22   seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified
23   under the next section, an implied warranty that the goods shall be fit for such purpose. *RCW*
24   *62A.2-315.*  An implied warranty will not arise if the buyer relies on his own skill or judgment,
25   rather than the seller's. *Casper v. E.I. Du Pont De Nemours & Co.,* 806 F.Supp. 903 (E.D.Wa
26   1992).  In this case, Platypus relied on its own skill and judgment in selecting the products used
27   and in the application of such products.  Specifically, Platypus tested the system and was satisfied
28   with those test results before it applied the system to the M/V Alexis.  Platypus never disclosed to

Sherwin-Williams its detailed application system and, as a result, Sherwin-Williams was never aware that Platypus was not following the product specifications.   Platypus exceeded the maximum mils dry film thickness for the entire system.  Platypus exceeded the maximum number of sealer coats recommended.  Platypus dried the wood products at a lower temperature than was recommended.  Platypus disregarded the specified dry times between coats of sealer.  Because of the aforementioned factors, there is no breach of implied warranty for a particular purpose.

CONCLUSION

For all of the foregoing reasons, Sherwin-Williams's Motion for Summary Judgment [docket #21] is **GRANTED**.   The case is dismissed.

It is so **ORDERED**.

Dated this 16th day of October, 2006

_____
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE